UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

| | |
|---|---|
| POLY-FLEX CONSTRUCTION, INC., a Texas corporation, | Case No. 1:07-cv-1090 |
| Plaintiff, | HONORABLE PAUL L. MALONEY |
| v. | |
| NEYER, TISEO & HINDO, LTD., d/b/a NTH CONSULTANTS, a Michigan corporation, | |
| Defendant. | |

---

## Opinion and Order

**Granting the Defendant's Motion to Dismiss the Complaint for Failure to State a Claim;
Determining that the Complaint is Barred by the Professional-Malpractice Limitations Period;
Terminating the Case**

The defendant moved to dismiss the complaint for failure to state a claim. The motion was fully briefed, and the court heard oral argument on September 4, 2008. Pursuant to the court's September 5, 2008 order, the parties submitted supplemental briefs as to whether PFC's breach-of-contract and contractual-indemnification claims (counts one and three) are time-barred. *See* Doc. Nos. 29 and 30, filed Sept. 15, 2008. For the reasons that follow, the court holds that all four claims are time-barred. Accordingly, the court will grant defendant's motion and dismiss the complaint.

Central Sanitary Landfill, Inc., owns and operates a Type II Municipal Solid Waste Landfill located in Pierson in Montcalm County, Michigan ("Landfill"), and is not a party to this action. Apparently in January 2002, Landfill hired plaintiff Poly-Flex Construction, Inc. ("PFC") to

construct a leak-detection system for the portion of the site known as the Cell VI-A Disposal Area, which is 3.8 acres.  *See* Amended Complaint filed March 25, 2008 ("Comp"), Ex C at 3, Sec. 2.0 ("Background").  Cell VI-A was connected to Cell VI-B, which was already constructed and licensed to receive waste, and on the north it bordered Cells V-A and V-B.  *Id.*  The contracted work included "construction of a leak detection system as a secondary collection system for landfill leachate, and the connection of the leak detection system to the secondary liner and leak detection system shared by other cells at the Project."  *See* Plaintiff PFC's Brief in Opposition to the Motion to Dismiss the Amended Complaint ("P's Opp") at 1.  PFC did the work that same year.  *See* Comp ¶¶ 5 & 11.

On February 6, 2002 Landfill issued a request for proposal ("RFP") "seeking a cost proposal from qualified firms to provide certification services for the construction of [the] Cell VI-A Disposal Area."  *See* Comp, Ex A at (RFP Letter from Landfill Environmental Manager Debbie Nurmi to NTH Project Manager Blaine Litteral) at 1.  Landfill was required to have such services performed to comply with Part 115 of the Michigan Natural Resources and Environmental Protection Act, Mich. Comp. Laws § 324.11501 *et seq.*  On February 20, 2002, NTH submitted a proposed "agreement for professional engineering services" relating to Cell VI-A, with a proposed price of $31,800, Comp ¶ 7 and Ex A at 2 (Letter from NTH's Litteral to Landfill's Debbie Nurmi) and *id.* at 3 *et seq.* (Proposed NTH-Landfill Agreement and attachments), and PFC accepted the offer.

Sometime in early May 2002, NTH issued its Certificate of Acceptance, certifying to Landfill and to the Michigan Department of Environmental Quality ("MDEQ") that the system was built in accordance with certain project specifications, including a construction permit issued by the MDEQ, the CQA Plan, and the Construction Drawings for Cell VI-A.  P's Opp at 1-2.  NTH's

Certificate of Acceptance was provided to the MDEQ as required by MICH. ADMIN. RR. 299.4916 and 299.4921.

On May 9, 2006, the MDEQ issued a Letter of Violation to Landfill. The MDEQ's letter stated, in its entirety:

> On April 20, 2006, staff of the Department of Environmental Quality (DEQ) conducted an inspection of the Central Sanitary Landfill solid waste disposal area, located at 21545 Cannonsville Road, Pierson, Michigan. The purpose of this inspection was to evaluate compliance with Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, MCL 324.11501 *et seq[.]*, and any administrative rules promulgated pursuant to this act. A copy of the evaluation report generated as a result of our inspection is enclosed for your records and review.
>
> Based upon information obtained and observations made during the inspection, staff of the DEQ has determined that the required leak detection system serving Phase VI-A was improperly constructed and not functioning, and therefore you are in violation of the following requirements of part 115:
>
> R 299.4424 Rule 424(1) states that "A secondary collection system shall be designed to operate as a leak detection system."
>
> R299.4424 Rule 424(2) requires, in pertinent part, that "A secondary collection system shall be capable of detecting, collecting, and removing leaks of hazardous constituents at the earliest practicable time through all areas of the top liner that are likely to be exposed to waste or leachate during the active life and postclosure care period . . . ."
>
> R299.4921 Rule 921(1) requires, in pertinent part, that "The construction quality assurance officer shall certify that a landfill was constructed in accordance with the CQA plan, these rules, and engineering plans approved by the department . . . . "
>
> In order to rectify the above, it will be necessary for you to prepare and submit a plan to correct the installation errors that prevent the leak detection system from functioning as required within 15 days of receipt of this letter of warning.
>
> This letter of warning does not preclude nor limit the DEQ's ability to initiate any other enforcement action, under state or federal law, as deemed appropriate.
>
> If you have any questions regarding this notice, please feel free to contact me.

Comp, Ex B (Letter from Terrance A. Hartman, R.S., Environmental Sanitarian, MDEQ Waste & Hazardous Materials Division) at 1-2.

In response to the violation warning letter, NTH and Landfill submitted an Investigation Plan to the MDEQ on May 24, 2006. The Investigation Plan, prepared by NTH, acknowledged,

> It appears that the primary composite liner (flexible membrane liner (FML) and geosynthetic clay liner (GCL)) and underlying secondary geocomposite drainage layer in Phase VI-A may not be connected to the respective companion layers in Phase VI-B, at least at the location of the tie-in at the southwest corner of Phase VI-A.
>
> * * *
>
> According to verbal reports and photographs provided by Mr. Paul Wakefield of FTS, the full-time CQA technician, exposing the tie-in between Phase VI-A and VI-B revealed that the liner system at the southwest boundary between these two cells might not have been constructed in accordance with the 2002 construction drawings and specifications.
>
> * * *
>
> To allow the construction of Phase VII-A to proceed, GSE repaired the liner system along the exposed tie-in between Phase VI-A and VI-B. This included connecting the secondary geocomposite drainage layer and primary FML between the two cells. This repair was documented by FTS and will be included in CAP [Correction Action Plan].

Comp Ex. C at 2 and 4. NTH proposed a series of measures designed to investigate the condition of the project work, *see* Comp Ex C at 6-9.

On May 29, 2002, NTH issued its final Certification Report. *See* Defendant's Motion to Dismiss the Amended Complaint for Failure to State a Claim ("MTD"), Ex 2 (Affidavit of NTH Chairman Kevin Hoppe, Professional Engineer, dated April 3, 2008 ("Hoppe Aff")) ¶ 2. NTH's Statement of Certification stated, in its entirety,

> During the construction of Phase VI A of the Central Sanitary Landfill, NTH Consultants, Ltd. monitored earthwork construction operations and; [sic] the installation of geosynthetic components including: HDPE liners; geosynthetic clay liner; primary and secondary leachate collection systems; and the construction of infrastructure components. Documentation by representations of NTH Consultants, Ltd. of the monitoring activities are presented in this report[.]

-4-

> I, Blaine A. Litteral, a Professional Engineer registered in the State of Michigan, hereby certify that representatives from NTH have monitored the construction activities associated with earthwork construction; the installation of geosynthetic components including:  geosynthetic clay liner; HDPE liners, drainage composites, and geotextiles; and primary and secondary leachate collection systems, for Phase VI A of Central Sanitary Landfill, Montcalm County, Pierson, Michigan.
>
> The limits of certification documented by this report are shown on the Construction Record drawing in Appendix C.  The Limits of Certification boundaries are as follows: the northern limit is the tie in of the geosynthetic liner system to the existing Phase V A and V B liner system; the western limit is the tie in to the Phase VI B liner system, the eastern limit is the inside edge of the anchor trench for the geosynthetic liner system (near the center of the eastern berm); and the southern limit extends to the inside edge of the anchor trench[.]
>
> To the best of my knowledge and belief, the construction at the aforementioned facility has been completed as documented by this report and the construction activities were completed in a manner that meets the intent of the project plans and specifications included in solid waste construction permit No. 8848.

MTD, Ex 2 (Hoppe Aff), Attachment.  NTH did not perform or monitor any work at the Landfill or issue any certification documents under the CQA after May 2002.

On December 20, 2006, PFC and Landfill entered into a three-page purported "Settlement Agreement and Assignment of Claim."  *See* Comp, Ex. D.  The settlement stated, in pertinent part,

> Landfill and MDEQ subsequently agreed to entry of a Consent Order requiring Landfill, among other things, to pay $21,500.00 to the State of Michigan in settlement of MDEQ's claim for a civil fine arising out of the violations found in the Letter of Warning.  Currently, MDEQ is reviewing the November 16, 2006 submission of the Landfill to implement an alternate monitoring program for Cell VI-A to effectively monitor any potential release during the remaining life of the Central Sanitary Landfill and for thirty (30) years thereafter.
>
> Landfill requested that Poly-Flex and Nth reimburse it for the aforementioned fine, out-of-pocket costs arising from the Letter of Warning, and estimated costs of implementing the alternate monitoring program in the approximate amount of $600,000.00 (collectively, the "Project Damages").  NTH rejected that request and NTH and Landfill have not resolved the dispute between them.  Poly-Flex and Landfill desire to settle the dispute between them on the basis set forth below.
>
> * * *
>
> *In consideration of payment by Poly-Flex to Landfill of $600,000.00* before

-5-

> December 31, 2006 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, *Landfill agrees to* release Poly-Flex . . . from all claims, demands, rights, actions, and causes of action, whether known or unknown, relating to the Project Damages, and to *assign all claims, demands, rights, actions or causes of action, whether known or unknown, of Landfill against NTH relating to the Project Damages.*

Comp, Ex D at 1 (emphasis added).

The December 2006 settlement agreement expressly reserved Landfill's right to rescind it if the MDEQ disapproved Landfill's proposed alternate monitoring program:

> *This Agreement is entered based on the assumption that the MDEQ will approve the aforementioned alternate monitoring program. If the program is not approved, Landfill may rescind this Agreement* by giving notice of rescission and returning the $600,000.00 to Poly-Flex within thirty (30) days of receiving notice of rejection of that program from the MDEQ.
>
> \* \* \*
>
> The rights and obligations created hereunder, including matters of construction or validity, shall be governed by and construed in accordance with the laws of Michigan.

Comp, Ex D at 2 (emphasis added). On November 5, 2007 – after PFC instituted this action – the MDEQ approved the alternate monitoring program proposed by the PFC-Landfill settlement. *See* Joint Stipulation of Fact filed Sept. 5, 2008 [document #28] and attached MDEQ letter.

PFC now sues NTH under Michigan common law to recover over $600,000 that it paid the Landfill, and the amounts that it may pay the Landfill in the future, for environmental investigation, monitoring, and remediation at the Landfill. PFC asserts four Michigan common-law claims: breach of the Landfill-NTH contract, negligence, contractual indemnification, and equitable indemnification. NTH moves to dismiss the complaint for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6), contending that all the claims are time-barred and lack merit.

**As to the breach-of-contract claim (count one),** NTH first contends that PFC had a duty to build the leak-detection system properly, not NTH, and that PFC's own admitted faulty

construction caused it to pay money to the Landfill, not any alleged deficiencies in NTH's certification services. *See* MTD at 2-4. Second, NTH contends that PFC was not required to reimburse the Landfill, but voluntarily chose to do so. *See* MTD at 4. Third, NTH points out that the complaint fails to allege that the Landfill-NTH contract permitted the Landfill to assign its rights to PFC under these circumstances. *See* MTD at 5.

NTH contends that even if the Landfill-NTH contract permitted Landfill to assign its rights to PFC under these circumstances, the assignment was invalid for four reasons. First, the contract itself nowhere expressly authorizes assignment, merely stating that it binds "permitted assigns." *See* MTD at 5-6. NTH points out that PFC has not alleged that Landfill gave such permission or that PFC is a "permitted assignee" within the meaning of the contract. *See* MTD at 8. Second, according to NTH, the Landfill-NTH contract was for personal services and Michigan common law requires the other contracting party (NTH) to consent to an assignment under such a contract. MTD at 9-11.

Third, NTH contends that a cause of action may not be validly assigned under Michigan law if the assignor retains any control or power of revocation, and at the time of the assignment Landfill retained the right of rescission (if the MDEQ disapproved NTH/Landfill's proposed corrective action plan) and other "potential legal rights against NTH." MTD at 6 & 11.[1]

---

[1]

In Michigan, "[n]o particular form of words is required for an assignment, but *the assigner must manifest an intent to transfer and must not retain any control or any power of revocation*." *Burkhardt v. Bailey*, 680 N.W.2d 453, 463 (Mich. App. 2004) (emphasis added, citations to out-of-state decisions omitted).

Because Landfill retained the right to rescind its settlement with PFC if the MDEQ did not approve the proposed alternate monitoring plan, there is a strong argument that the assignment was not valid and effective when it was made (in the December 2006 settlement). For the same reason, there is a strong argument that the Landfill-to-PFC assignment became valid and effective, if ever, only after the MDEQ approved the plan (because that event extinguished Landfill's right to rescind the settlement and rendered the assignment unconditional).

Fourth, NTH contends that Michigan common law prohibits assignment of a contractual right if it materially increases the risk to the other contracting party. *See* MTD at 11-12. For example, CQA section 3.10 bars NTH from divulging confidential information to anyone other than Landfill and its attorneys, but defense of this action may require NTH may require it to use (and thereby divulge to PFC) some of Landfill's confidential information. *See* MTD at 12.[2]

_____

MDEQ did not approve the plan until December 2007. That approval removed this particular ground for arguing that the Landfill-to-PFC assignment was invalid or ineffective. In other words, in December 2007 the assignment became effective and enforceable under Michigan common law (assuming *arguendo* that it was not prohibited by the terms of the Landfill-NTH contract, prohibited by Michigan common law as the assignment of a personal-services contract, or prohibited by Michigan common law because it materially increased the risks to the non-assigning party (NTH)).

That was *after* PFC filed this action as the purported assignee of Landfill's rights. Therefore, PFC probably did not have an effective assignment of rights when it filed the original complaint on October 31, 2007. PFC could have had an effective assignment in place, though, when it filed the *amended* complaint on March 25, 2008 [document #14].

But the court need not decide whether, and when, the Landfill-to-PFC assignment became valid and effective, because the court holds that all claims asserted in the original and amended complaints (the identical claims) are time-barred under MICH. COMP. LAWS § 600.5805(1) & (6) and § 600.5839(2). As explained below, the applicable limitations period expired on May 20, 2007.

Therefore, even if the Landfill-PFC assignment was permitted by the Landfill-NTH contract, Landfill assigned claims which were already time-barred when the assignment became effective.

[2]The court intimates no opinion as to whether Landfill knew, or should have known, that:

(1)   Michigan common law does not allow the assignment to become effective (if ever) until the MDEQ later approved the alternate monitoring plan;

(2)   PFC's claims are subject to the six-month malpractice limitations period of MICH. COMP. LAWS § 600.5838(2);

(3)   Under MICH. COMP. LAWS § 600.5838(1), PFC's claims accrued no later than December 2006, when PFC entered the settlement (agreeing to pay $600,000-plus to Landfill);

(4)   PFC's claims would be time-barred if MDEQ approved the plan more than six months

Moreover, NTH contends that even if Landfill validly assigned its rights to PFC, PFC's breach-of-contract claim still fails, as a matter of law, for three reasons.  First, § 4.1 of the CQA contract expressly bars recovery for improper work by PFC, and it is "commonly understood that professional engineers do not have responsibility for construction and courts as a general rule enforce contractual disclaimers to that effect."  MTD at 13 (citing 1st Circuit, 7th Circuit, and S.D.N.Y.).

Second, the Landfill-to-PFC assignment purports to convey only claims and rights related to "Project Damages", whose definition does not encompass the type of expenses which PFC seeks to recover.  According to NTH, § 3.3 of the CQA contract covers only personal injury or property damage claims brought against Landfill, and PFC has not asserted such claims.  MTD at 13.

Third, NTH contends that section 1.2 of the CQA contract sets forth a specific, limited remedy for Landfill (or its permitted assigns) in the event that NTH failed to use "customarily accepted engineering practices."  Section 1.2 authorizes Landfill to require NTH to provide, *gratis*, "the professional engineering services necessary to correct deficiencies in the services or work which are so caused", but only if it reported the deficiencies to NTH "within one year from the completion of services."  *See* MTD at 14 (citing Comp Ex A § 1.2).  The complaint itself alleges that Landfill did not report any alleged deficiencies in NTH's services until 2006, about four years after "the completion of [NTH's] services" on the Cell VI-A project.  MTD at 14 (citing Comp ¶¶ 11-13).  In any event, NTH contends that section 1.2 is of no avail to PFC because "the remedies sought in the Complaint do not include the provision of professional engineering services by NTH."  MTD at 14.  In other words, PFC seeks only monetary damages from NTH, not the free provision of

after the settlement.

-9-

corrective engineering services, which is the sole remedy contemplated and authorized by section 1.2.

**NTH contends that the negligence claim (count two) fails for three reasons.** First, NTH contends that the claim is time-barred, either under Michigan's two-year statute of limitations governing certain professional-malpractice claims, MICH. COMP. LAWS § 5805(6), or its three-year statute governing other negligence claims, MICH. COMP. LAWS § 5805(10). *See* MTD at 15.

In addition, NTH relies on MICH. COMP. LAWS § 5838(2) for the proposition that a malpractice plaintiff must bring such a claim within six months from when it discovered or reasonably should have discovered the alleged malpractice. *See* MTD at 15-16. NTH argues that Landfill should have discovered the existence of its claims against NTH no later than May 9, 2006 (when the MDEQ issued the Letter of Violation contrary to NTH's Certification that the project work was in order) or at least December 20, 2006 (when PFC entered the agreement to reimburse Landfill for the costs caused by PFC's apparently inadequate construction and/or NTH's allegedly negligent certification of the construction). *See* MTD at 16.

Second, NTH contends that the negligence claim lacks merit because it had no independent duty to PFC, and because PFC's own admitted inadequate work was the proximate cause of the damages suffered by Landfill. *See* MTD at 18-19. Further, NTH contends that purely-economic losses are not recoverable in tort unless accompanied by physical property damage or personal injury. MTD at 20. NTH next contends that voluntary payments are not recoverable in tort. MTD at 20-21.

As to count three, NTH contends that the contractual-indemnification claim fails because the Landfill-to-PFC assignment was invalid for the reasons stated during the breach-of-contract

discussion.  MTD at 2 and 22.  Even if the assignment is valid, NTH argues, PFC has no right to contractual indemnification because CQA § 3.3 (indemnity) and § 4.1 (contractor responsibility) do not authorize recovery for this type of damage under these circumstances.

As to count four, NTH contends that the equitable-indemnification claim fails because PFC's admitted inadequate construction of the leak-detection system renders it an "active wrongdoer" and "actively negligent", both of which bar an assignee from securing equitable relief under NTH's reading of Michigan common law.  *See* MTD at 23-24.

## PROCEDURAL HISTORY

In December 2006, PFC filed a complaint against NTH in Texas state court.  NTH removed the case to the United States District Court for the Northern District of Texas and moved to dismiss based on lack of personal jurisdiction.  After jurisdictional discovery, PFC voluntarily dismissed in the action in June 2007.  Shortly thereafter, PFC filed a complaint against NTH in Arizona state court.  NTH removed the case to the U.S. District Court for the District of Arizona, which dismissed the case without prejudice for lack of personal jurisdiction.

PFC filed the instant complaint on November 1, 2007, and NTH responded by timely filing a motion to dismiss on November 30, 2007.  On March 24, 2008, this court *sua sponte* dismissed the complaint without prejudice because it failed to allege sufficient facts to establish the existence of diversity jurisdiction.  PFC timely filed an amended complaint that cured the deficiency, and NTH moved to dismiss the amended complaint on April 4, 2008.  PFC filed an opposition brief on May 2, 2008, and NTH filed a reply brief in support of its motion on May 15, 2008.

**PFC's Claims**

Counts one claims that NTH breached the CQA contract by "fail[ing] to properly perform the construction quality assessment work . . . ."  Am Comp ¶ 23.  Count two claims that NTH was negligent in "failing to exercise ordinary and reasonable care in performing the construction quality assessment and by negligently issuing a Certificate of Acceptance when in fact the work was not performed in accordance with the plans and specifications . . . ."  *Id.* ¶ 27.  Count three seeks indemnification, pursuant to section 3.3 of the CQA contract, for costs "including, but not limited to $600,000.00 in reimbursement to Landfill for environmental investigation and remediation costs, plus attorneys fees, and potential future environmental investigation and remediation costs."  *Id.* ¶¶ 31-32.  Count four seeks *equitable* indemnification of the same costs, contending that Poly-Flex

> * * *  was not negligent or otherwise guilty of any fault in connection with the negligent performance of NTH's construction quality assessment services.
>
> * * *  reimbursed Landfill for the damages caused to Landfill by NTH's breach of its CQA Contract and the negligent performance of NTH's construction quality assessment services.
>
> * * *  has at least partially discharged NTH's obligation to reimburse Landfill for environmental investigation and remediation costs.

*Id.* ¶¶ 35-37.  Poly-Flex reasons that "[i]t will be inequitable, and NTH will be unjustly enriched at the expense of Poly-Flex, if NTH is not required to indemnify Ply-Flex for the costs reimbursed to Landfill for the environmental investigation and remediation costs . . . ."  *Id.* ¶ 38.  None of the claims seeks non-monetary relief.


CHOICE OF LAW

The contract contains a clause providing that issues relating to the contract will be governed

-12-

and construed in accordance with Arizona law.  *See* Am Comp, Ex A § 4.14.  NTH contends that under Arizona choice-of-law rules, an Arizona state court would apply Michigan's substantive law, MTD at 2 n.2, and NTH does not dispute that contention; the court will apply Michigan law.


## LEGAL STANDARD:  DISMISSAL FOR FAILURE TO STATE A CLAIM

This court assesses a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted  under the same standard as a Rule 12(c) motion for judgment on the pleadings.  *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).  Such motions turn on legal issues, not an assessment of the evidence.  *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 640 n.5 (6th Cir. 2006) (Griffin, J.) ("*Tech Rec*"); *see also Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985) ("[M]otions for judgment on the pleadings and dismissal for failure to state a claim on which relief can be granted . . . consist exclusively of issues of law.").  A Rule 12(c) motion is simply one permissible avenue for contending that the complaint should be dismissed because it fails to state a claim on which relief can be granted.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 507 (2006) ("a defense of failure to state a claim upon which can be granted . . . may be made in any pleading . . . or by motion for judgment on the pleadings, or at the trial . . . .") (quoting FED. R. CIV. P. 12(h)(6)).

Such motions "presume as a legal matter the lack of any need for an evidentiary hearing . . . ."  *US v. Raddatz*, 447 U.S. 667, 693-94 (1980).  Indeed, the court must accept all of the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  *Tech Rec*, 186 F. App'x at 640 n.5 (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) ("*PONI*")); *see also Bohanan v. Bridgestone/Firestone No. Am. Tire, LLC*, 260 F. App'x 905, 906 (6th Cir. 2008) (citing *Ziegler v.*

*IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6ᵗʰ Cir. 2001)).  But the court need not draw unwarranted factual inferences or accept the plaintiff's *legal* conclusions.  *Bohanan*, 260 F. App'x at 906 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6ᵗʰ Cir. 1999)).

And each claim's factual allegations must *plausibly* suggest a viable claim; the claim must be plausible and not merely conceivable.  *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6ᵗʰ Cir. 2007) (en banc) (Sutton, J., joined by Griffin et al.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. –, –, 127 S.Ct. 1955, 1974 (2007)); *see generally Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 296 n.1 (6ᵗʰ Cir. 2008) (discussing our Circuit's standard for 12(b)(6) motions after *Twombley* and *Erickson v. Pardus*, 550 U.S. –, 127 S.Ct. 2197 (2007)).  "The 'factual allegations must be enough to raise a right to relief above the speculative level'", not merely create a "'*suspicion* of a legally cognizable cause of action . . . .'" *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6ᵗʰ Cir. 2008) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974) (internal alterations omitted).[3] There must be either direct of inferential allegations regarding the material elements of each claim. *LULAC v. Bredesen*, 500 F.2d 523, 527 (6ᵗʰ Cir. 2007) (citing *Twombley*, 550 U.S. at –, 127 S.Ct. at 1969).

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits.  *LaFace Records, LLC v. Does 1-5*, 2008 WL 513508, *3 (W.D. Mich. Feb. 22, 2008) (Maloney, J.) (citing *Amini v. Oberlin College*, 259 F.3d 493, 502 (6ᵗʰ Cir. 2001)).

---

[3]

*Twombley* "retired the 'no set of facts' formulation of the Rule 12(b)(6) standard and dismissed an antitrust-conspiracy complaint because it did not contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 337 n.4 (6ᵗʰ Cir. 2007) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974).

## LEGAL STANDARD: A FEDERAL COURT'S INTERPRETATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Griffin, J.) (citation omitted)).  If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts:  "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'"  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)).  In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605.

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as that state's courts would.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")).  If a state

-15-

court would not be bound by a particular state-court decision, then neither is this court.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*14 (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis."  This subsection makes no distinction based on when the decision was issued..  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*14.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule."  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*14 (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*14.  When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails.  *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at \*15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

-16-

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))).  Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals.  *See Republic-Franklin Ins. Co. v. Bosse*, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR.2d Courts § 225 (1965).  Accordingly, this court will seriously consider our Circuit's interpretation of state law but is not bound by it.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15.

**Counts One and Three:**
**PFC Fails to State a Claim for Breach of Contract or Contractual Indemnification**

The court need not decide whether Landfill's assignment of its rights to PFC was valid or

if so, *when* it became valid or effective.  Even if the assignment was valid and effective prior to the date that PFC asserted these claims, both contract claims are time-barred as explained below.[4]

### PFC's Claims Are Governed by M.C.L. § 600.5838 / § 600.5805(6), The Period Generally Governing Malpractice Claims against Non-Medical Professionals

"It is well accepted that in ruling on a statute of limitations defense[,] the court may look behind the technical label that plaintiff attaches to a cause of action to the substance of the claim asserted."  *Local 1064, RWDSU AFL-CIO v. Ernst & Young*, 535 N.W.2d 187, 189 (Mich. 1995) (citations omitted); *see also Citizens Ins. Co. v. Scholz*, 709 N.W.2d 164, 166 (Mich. App. 2005) ("'Absent disputed questions of fact, whether a cause of action is barred by a statute of limitations is a question of law . . . .'") (quoting *Young v. Sellers*, 657 N.W.2d 555, 557 (Mich. App. 2002) (quoting *Hudick v. Hastings Mut. Ins. Co.*, 637 N.W.2d 521, 523-24 (Mich. App. 2001))).[5]

The court perceives four options.  The parties's original briefs primarily argued over which

---

[4]

The applicable limitations period expired in May 2007, which was before PFC filed the original complaint (October 31, 2007).  Accordingly, the court need not consider whether the amended complaint would "relate back" to the time of the original complaint's filing for limitations purposes.  *See generally Moore v. Tennessee*, 267 F. App'x 450, 454-56 (6th Cir. 2008) (applying FED. R. CIV. P. 15(c), which governs when an amended pleading relates back to the time of an earlier pleading).  Such a question would arise only if the limitations period expired *after* the filing of the original complaint but *before* the filing of the amended complaint (March 25, 2008).

[5]

Alternatively,  NTH contends that even if its "negligence" claim is subject to Michigan's three-year statute of limitations governing negligence claims, MICH. COMP. LAWS § 600.5805(10), it is still untimely.  NTH also contends that the negligence claim lacks merit because it had no independent duty to PFC, and because PFC's own admitted inadequate work was the proximate cause of the damages suffered by Landfill (and reimbursed by PFC).  Finally, NTH contends that neither purely-economic losses nor voluntary payments are recoverable in tort in Michigan.  Because the court determines that the negligence claim is time-barred under § 600.5838, the court need not address these alternative arguments for timeliness or merits dismissal of the negligence claim.

-18-

of two statutes of limitations applies.  Defendant NTH preferred the statute generally governing malpractice claims against non-medical professionals (MICH. COMP. LAWS § 600.5838 and 600.5805(6)).  Plaintiff PFC preferred the statute governing general negligence claims (MICH. COMP. LAWS § 600.5805(10)) for count two's "negligence" claim, and the six-year statute governing contract claims  (MICH. COMP. LAWS § 600.5807(8)) for count one's "breach of contract" claim and count three's "contractual indemnification" claim.  The last possibility is the statute governing certain claims against professional, licensed engineers and architects (MICH. COMP. LAWS § 600.5839) related to injuries caused by defective, unsafe improvement to real property.

**The court agrees with PFC that the statute governing certain claims against professional engineers, architects, and surveyors, MICH. COMP. LAWS § 600.5839, does not apply**, though not entirely for the reasons urged by PFC.  Section 600.5839(1) provides, in full,

> No person may maintain any action to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, against any state licensed architect or professional engineer performing or furnishing the design or supervision of construction of the improvement, or against any contractor making the improvement,
>
> more than 6 years after the time of occupancy of the completed improvement, use, or acceptance of the improvement,
>
> or 1 year after the defect is discovered or should have been discovered, provided that the defect constitutes the proximate cause of the injury or damage for which the action is brought and is the result of gross negligence on the part of the contractor or licensed architect or professional engineer.
>
> However, no such action shall be maintained more than 10 years after the occupancy of the completed improvement, use, or acceptance of the improvement.

Paragraph breaks added.[6]

NTH satisfies one element of § 600.5839(1), because the employee who signed the certification was a state-licensed professional engineer, and NTH was a contractor, as defined by MICH. COMP. LAWS § 600.5839(3) and (4), respectively:

> (3)  As used in this section, "state licensed architect or professional engineer" . . . means any individual so licensed, or any corporation, partnership, or other business entity [NTH] on behalf of whom the state licensed . . . professional engineer [Blaine Litteral] . . . is performing or directing the performance of the . . . professional engineering . . . service.

> (4)  As used in this section, "contractor" means an individual, corporation, partnership, or other business entity which makes an improvement [the leak-detection system] to real property [the landfill].

NTH satisfies a second element of § 600.5839(1), because the leak-detection system constitutes an improvement to real property.  For purposes of this statute of limitation, "[a]n improvement is a 'permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.'"  *Pitsch v. ESE Michigan, Inc.*, 593 N.W.2d 565, 602-03 (Mich. App. 1999) (quoting *Travelers Ins. Co. v. Guardian Alarm Co. of Michigan*, 586 N.W.2d 760, 762 (Mich. App. 1998) (quoting *Pendszu v. Beaser East, Inc.*, 557 N.W.2d 127, 131 (Mich. App. 1996))).  *Contrast Lumbermen's Underwriting Alliance v. Rue Const.*

---

[6]

MICH. COMP. LAWS § 600.5839 has six subsections.  Subsection (2) is not relevant here, because it governs claims "based on error or negligence of a state licensed land surveyor in the preparation of a survey or report."

MICH. COMP. LAWS § 600.5839(5) and 6) do not apply, because they deal with the effective date of a 1985 amendment to subsection (1).  NTH did all the work at issue here well after the effective date of the 1985 amendment.  In turn, it is undisputed that Landfill's claim, or PFC's claim, could not have accrued until at least 2002, when PFC both began and finished the relevant work on the leak-detection system – well after the effective date of the 1985 amendment.

-20-

*Co., Inc.*, 2005 WL 1186965, *2 (Mich. App. May 19, 2005) (§ 600.5839(1) did not apply, because record alleged only that contractor removed a portion of a concrete slab, which did not constitute an improvement).   The leak-detection system was a permanent addition, involved the expenditure of labor and money, enhanced the capital value of the land, and was "designed to make the property more useful or valuable" by enabling it to function as a landfill – rather than an "ordinary repair." *Pitsch*, 593 N.W.2d at 602-03.

PFC's count-two claim does not satisfy a third element of § 600.5839(1), which applies to claims that seek "damages for any injury to property, real or personal . . . arising out of the defective and unsafe condition of an improvement to real property" or "contribution or indemnity for damages sustained as a result of such injury."   The leak-detection system was apparently "defective", in the sense that it was not built entirely in accordance with the contractual specifications and drawings, state construction permit, and/or state environmental regulations.   The leak-detection was "unsafe" because that defect apparently posed a heightened risk of leakage and contamination.   But PFC does not seek damages arising from or caused by the defective construction of the leak-detection system – after all, it constructed that system itself.   Rather, PFC seeks damages from the "defective" certification issued by NTH.   In this context, it stretches the words "defective" and "unsafe" beyond their ordinary, sensible, and commonly understood meaning to apply them not to construction of the improvement, but to an allegedly negligent certification that the improvement was constructed in accordance with contractual and regulatory criteria.

In addition, the record does not bring NTH within one other criterion for application of MICH. COMP. LAWS § 600.5839(1).   NTH did not "furnish the . . .supervision of construction of the improvement . . . ." On the contrary, the Landfill-NTH CQA contract provided that NTH was not

to "direct, supervise, or control" PFC's work designing or building the leak-detection system. *See* Comp Ex A § 4.1.

For the foregoing reasons, MICH. COMP. LAWS § 600.5839(1), the limitations and repose period governing certain claims against engineers for defective, unsafe improvements to real

property, does not govern PFC's claims.[7] [8]

---

[7]

    As written and punctuated, § 5839(1) as a whole might seem to apply only "provided that the defect constitutes the proximate cause of the injury or damage for which the action is brought and is the result of gross negligence on the part of the contractor or licensed architect or professional engineer."  On that view, neither § 5839(1)'s six-year-from-completion period nor its one-year-from-discovery period applies unless the party has alleged and shown a genuine issue as to proximate cause and gross negligence.

    The Michigan Court of Appeals, however, reads the "provided that" items as prerequisites only for the application of the one-year-from-discovery period, not as prerequisites for application of the six-year-from-completion period.  "According to the statute, ordinary negligence claims against contractors are subject to a six-year period of limitation, while claims of *gross* negligence are subject to a one-year period following discovery." *Smith v. Quality Const. Co.*, 503 N.W.2d 753, 754-55 (Mich. App. 1993) (p.c.) (emphasis added) (interpreting § 600.5839(1) and citing *Mich. Millers Mut. Ins. Co. v. West Detroit Bldg. Co., Inc.*, 494 N.W.2d 1, 3 (Mich. App. 1992) (citing *Beauregard-Bezou v. Pierce*, 487 N.W.2d 792, 795 (Mich. App. 1992) (interpreting § 600.5839(1), court referred to "the Legislature's intent to limit causes of action against building contractors not involving allegations of gross negligence to six years"))).

    *See, e.g., City of Litchfield v. Union Const. Co.*, 1997 WL 33344061, *2 n.2 (Mich. App. Oct. 17, 1997) (p.c.) ("Plaintiff conceded below that the one-year discovery period [of § 600.5839(1)] is inapplicable in this case because its claim was not founded on gross negligence.");

    *Jungslager v. Lampe*, 2006 WL 335836, *2 (Mich. App. Feb. 14, 2006) (p.c.) ("[P]laintiffs' reliance on the one-year discovery period would be misplaced even if we were to find that discovery occurred at a later date.  A plaintiff who wishes to take advantage of this provision must demonstrate gross negligence on the part of the contractor.") (citing MICH. COMP. LAWS § 600.5839(1));

    *Dalton Twp. v. Tridonn Const. Co.*, 2005 WL 2323469, *1 (Mich. App. Sept. 22, 2005) (p.c.) ("An action against a contractor for damages 'arising out of the defective and unsafe condition of an improvement to real property' must be filed within six years 'after the time of . . . use, or acceptance of the improvement.'  An action may be filed within one year after 'the defect . . . should have been discovered, provided that the defect . . . is the result of gross negligence on the part of the contractor.'").

[8]

    As noted, PFC's claims do not fall within the ambit of MICH. COMP. LAWS § 600.5839(1) at all.  Even if PFC's claims satisfied the general criteria for application of § 600.5839(1), for two reasons they would not trigger the harsher one-year-from-discovery provision within that subsection.

    First, PFC has not alleged gross negligence, which Michigan statute elsewhere defines as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

-23-

The court next examines the second possible statute of limitations.  **NTH urges the court to apply the statute generally governing malpractice claims against non-medical professionals.** M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 600.5838 provides, in its entirety:

> (1) Except as otherwise provided in section 5838a [governing medical malpractice claims], a claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession[,] accrues at the time that person discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

> (2) Except as otherwise provided in section 5838a, an action involving a claim based on malpractice may be commenced at any time within the applicable period prescribed in sections 5805 [M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 600.5805] or 5851 to 5856 [M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> §§ 600.5851 - 600.5856],[9] or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later.

> The burden of proving that the plaintiff neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim shall be on the plaintiff.

> A malpractice action which is not commenced within the time prescribed by this

_____

*Xu v. Gay*, 668 N.W.2d 166, 169-70 (Mich. App. 2003) (citing *Jennings v. Southwood*, 521 N.W.2d 230, 235 (Mich. 1994) (citing Gov't Tort Liability Act, M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> § 691.1407(2)(c))).

Second, it is at best unclear whether NTH's allegedly negligent certification of the leak-detection system was "the proximate cause of the . . . damage for which the action is brought," i.e., the proximate cause of PFC voluntarily agreeing to reimburse Landfill for environmental investigation, monitoring, and remediation costs.

[9]

M<small>ICH</small>. C<small>OMP</small>. L<small>AWS</small> §§ 600.5851 - 600.5856 do not apply to toll the limitations period here.

Sec. 5851 deals with the tolling of a claim due to infancy, insanity or incarceration.
Sec. 5852 addresses a claimant's death within or shortly after expiration of the period.
Sec. 5853 deals with a defendant's absence from Michigan when a claim accrues against him.
Sec. 5854 deals with war preventing a person from bringing a claim in Michigan's courts.
Sec. 5855 deals with the defendant's alleged fraudulent concealment of the existence of a claim or the identity of a person who is liable on the claim.
Sec. 5856 deals with tolling of a statute of limitations or statute of repose.

subsection is barred.

Paragraph breaks added.

It is undisputed that the NTH employee who drafted the Statement of Certification, Blaine Litteral, was a professional engineer registered with the State of Michigan, *see* MTD, Ex 2 (Hoppe Aff), so the court finds that NTH was a "member of a state licensed profession" for the purpose of MICH. COMP. LAWS § 600.5838.

The question then would be whether PFC's "negligence" claim is "based on the malpractice" of NTH. As a matter of law, the court answers this question in the affirmative. For one thing, PFC asserted separate claims for breach of contract and negligence. If its negligence claim is to have substance and legal significance distinct from the contract claim, it necessarily rests on the premise that NTH failed to adhere to the applicable standard of care for engineers engaged in construction certification. PFC has not persuasively shown how NTH's alleged negligence can be meaningfully separated from its failure to adhere to the standard of care governing the engineering profession's certification function. This is particularly true given PFC's statement that

> *By virtue of the Assignment*, Plaintiff properly alleged the elements of a claim against Defendant in its Complaint by stating that Defendant *owed a duty to Landfill to properly perform its construction quality assessment services*, Defendant breached that duty, and as a result of the breach of that duty, Landfill was injured.

PFC Opp at 15 (emphasis added). *See Barnard v. Dilley*, 350 N.W.2d 887, 888 (Mich. App. 1984) (p.c.) ("Plaintiff also claimed that Defendant Dilley [an attorney] was liable to her based on a general theory of negligence. This claim was properly rejected. . . . To establish a tort, one must first establish a duty to the claimant imposed on the alleged tortfeasor. *The only claim of duty . . . arises out of the attorney-client relationship . . . . Where the alleged duty arises out of such a relationship, the tort claim is one for malpractice and malpractice only.*") (emphasis added).

The court holds that PFC's claims denominated as "breach of contract" and "contractual indemnification" are governed by MICH. COMP. LAWS § 600.5838 as well.  Preliminarily, the court notes that the existence of a contract between the professional and the client does nothing, by itself, to characterize a claim as a contract claim rather than a malpractice claim cloaked in contract garb. After all, the very definition of professional malpractice presumes a contract between the client and the professional.  *See Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (Mich. 2004) ("A professional relationship sufficient to support a claim of medical malpractice exists in those cases in which a licensed health care professional . . . [was] subject to a duty that required [that] professional . . . to render professional health care services to the plaintiff.") (citing, *inter alia*, *Dyer v. Trachtman*, 679 N.W.2d 311 (Mich. 2004) and *Delahunt v. Finton*, 221 N.W.2d 168, 169 (Mich. 1928) ("Malpractice, in its ordinary sense, is the negligent performance by a physician or surgeon of the duties devolved and incumbent upon him on account of his contractual relations with his patient.")).[10]

Count one alleges that NTH's acts, "specifically a failure to properly perform the construction quality assessment work", constitute a breach of contract.  Comp ¶ 21.  The "construction quality assessment work" referred to in paragraph 21 of the amended complaint is fleshed out in paragraphs 7 and 8 of the amended complaint, and in the NTH-Landfill Professional

---

[10]

See also *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70, 80 (Mich. App. 1989) ("'Malpractice' denotes a breach of duty owed by one in rendering professional services to a person who has contracted for such services.") (citing, *inter alia*, *Rogers v. Horvath*, 237 N.W.2d 595, 597 (Mich. App. 1975), *overruled o.g. by Dyer*, 679 N.W.2d 311 (citing, *inter alia*, *Kambas v. St. Joseph's Mercy Hosp.*, 205 N.W.2d 431 (Mich. 1973)).

Engineering Consulting Services Agreement.  *See* Comp Ex A.[11]  Count three alleges that PFC is

entitled to contractual indemnification pursuant to section 3.3 of the Landfill-NTH agreement.  That

section requires NTH to indemnify Landfill (and thus its purported assignee PFC) from certain

claims arising from its professional services, namely those claims

> attributable to any injury or death of a person or damage to or loss of property arising
> from the breach by [NTH] of its obligations under this Agreement or from any
> willful or negligent act, omission or delay on the part of [NTH], its servants or agents
> in performing the services or as a result of the services.

Comp ¶ 29 and Comp Ex A § 3.3.  Notwithstanding PFC's assertions to the contrary, both its

contract-based claims essentially allege that NTH failed to render its certification service in the

competent, careful, thorough, workmanlike manner demanded of members of the engineering

profession.  This conclusion is unavoidable given the context, stated purpose, and language of the

NTH-Landfill CQA contract.

Most significantly, section 1.2 of the Landfill-NTH contract provides that NTH "shall

exercise skill, care and diligence in the performance and provision of the services required by this

Agreement" and that NTH "*shall carry out its obligations under this Agreement in accordance with*

*customarily accepted good professional engineering practices*."  Comp Ex A (emphasis added); *see*

*also* MICH. COMP. LAWS § 339.2001(g) (defining the "practice of professional engineering").  Given

the nature of the work required by the NTH-Landfill agreement, and the nature of NTH's alleged

dereliction, Michigan courts would not permit PFC to do an end-run around the deliberately more-

stringent limitations period for malpractice claims by employing breach-of-contract, contractual-

---

[11]

Because the Landfill-NTH CQA contract is attached to the complaint, it "is a part of the
pleading for all purposes", *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008) (citing FED.
R. CIV. P. 10(c)), *reh'g & reh'g en banc denied* (6th Cir. July 31, 2008).

indemnification, or equitable-indemnification language.

For example, following *Barnard*, the Michigan Court of Appeals has held that a complaint alleging that "defendant breached the alleged agreement by failing to properly diagnose the decedent's ailments and render appropriate medical care" was a malpractice action, not a contract action. *See Penner v. Seaway Hosp.*, 427 N.W.2d 584, 588 (Mich. App. 1988). Similarly, in *Seebacher v. Fitzgerald, Hodgman, Cawthorne & King, P.C.*, 449 N.W.2d 673 (Mich. App. 1989), the Court of Appeals held that a malpractice statute "applies to a legal malpractice action even when phrased as a breach of contract to render competent legal services." *Id.* at 675 (citing *Stroud v. Ward*, 425 N.W.2d 490 (Mich. App. 1988)).[12] The court does not find *Penner* and *Seebacher* distinguishable merely because they involved medical and legal professionals, respectively, rather than an engineer. As the Michigan Supreme Court has stated, when considering claims alleging "failure to exercise the care and skill of those ordinarily skilled in the business * * * the responsibility of an architect does not differ from that of a lawyer or physician." *Bayne v. Everham*, 163 N.W. 1002, 1008 (Mich. 1917) (unanimous decision).

The decision cited by plaintiff PFC regarding its "negligence" claim, *Pukke v. Hyman Lippitt, P.C.*, 2006 WL 1540781 (Mich. App. June 6, 2006), is not to the contrary, and is of no avail regarding the contract-based or equitable-indemnification claims either.

In *Pukke*, the defendant law firm filed a Rule 12(b)(6) motion to dismiss their former clients' breach-of-fiduciary-duty claims as duplicative of their malpractice claims – and time-barred under

---

[12]

Following *Seebacher*, *see, e.g., Diehl v. McEvers*, 2000 WL 33405382 (Mich. App. Oct. 27, 2000) (p.c.) (P.J. Richard Allen Griffin, JJ. Cavanagh & Gage) (affirming summary disposition for defendant attorney and holding that malpractice statute of limitations applied both to legal-malpractice claim and to claim denominated as "breach of contract").

the statute of limitations governing malpractice claims.  Attempting to save his fiduciary-duty claim

as distinct from a malpractice claim, the plaintiff cited *Adkins v. Annapolis Hospital*, 323 N.W.2d

482 (Mich. App. 1982); *Barnard v. Dilley*, 350 N.W.2d 887 (Mich. App. 1984); and *Aldred v.

O'Hara-Bruce*, 458 N.W.2d 671 (Mich. App. 1990).  The panel – P.J. Murphy and Judges

O'Connell and Murray – wrote as follows:

> All of these cases stand for the proposition that where a party asserts various claims
> against a defendant-attorney arising out of an attorney-client relationship, the
> applicable statute of limitations depends upon the malpractice action where the same
> set of facts supports two distinct causes of action.  *See Adkins*, 323 N.W.2d at 485;
> *Barnard*, 350 N.W.2d at 887-88; *Aldred*, 458 N.W.2d at 672-73.
>
> Moreover, in *Prentiss Family Foundation v. Barbara Ann Karmanos Cancer Inst.*,
> 689 N.W.2d 900, 908 (Mich. App. 2005), the Michigan Court of Appeals explained
> that breach of fiduciary duty claims are not duplicative of legal malpractice claims.
>
>> The conduct required to constitute a breach of fiduciary duty requires
>> a more culpable state of mind than the negligence required for
>> malpractice.  Damages may be obtained for a breach of a fiduciary
>> duty when a "position of influence has been acquired and abused, or
>> when confidence has been reposed and betrayed."
>
> *Id.* (citation omitted).
>
> Furthermore, this court has held that "the interest involved in a claim for damages
> arising out of a fraudulent misrepresentation differs from the interest involved in a
> case alleging that a professional breached the applicable standard of care.  Simply
> put, fraud is distinct from malpractice." *Brownell v. Garber*, 503 N.W.2d 81, 87
> (Mich. App. 1993) [(Shepperd, J.) (citing 1 Mallen & Smith § 8.8 at 421)].

*Pukke*, 2005 WL 3556201 at *20-21.  Accordingly, the fiduciary-duty claims were not subject to the

malpractice limitations period and thus were not time-barred.  The *Pukke* panel denied the motion

to dismiss.  *Id.* at *21.

The *Pukke* panel was bound by the holdings of *Prentiss*, 689 N.W.2d at 908, and *Brownell*,

503 N.W.2d 81, that fiduciary-duty and fraud claims inherently are not equivalent to or subsumed

within a malpractice claim. *See also Cliff v. Hyman Lippitt, P.C.*, 2005 WL 3556201, *20-21 (E.D. Mich. Dec. 29, 2005) (Duggan, J.) (likewise following *Prentis Family Foundation* to hold that clients' fiduciary-duty claim against their attorneys was not subject to malpractice limitations period). Here, by contrast, PFC has identified no Michigan decision holding that *negligence, contract*, or unjust-enrichment claims are categorically / necessarily not duplicative of or subsumed within a malpractice claim. Nor has the court located any such decisions. This is not surprising, given that contract, negligence, and equitable-indemnification claims – unlike fiduciary-duty claims – do not require proof of a different *mens rea* than a professional-malpractice claim. On these bases, *Pukke* and *Cliff* are distinguished from our case.

Moreover, the reasoning that *Pukke* followed from *Brownell* is inapposite to PFC's negligence claim: "the interest involved in a claim for damages arising out of" mere negligence does *not* substantially "differ from the interest involved in a case alleging that a professional breached the applicable standard of care." On the contrary, breach of the applicable profession's standards of care is part and parcel of a negligence claim against a licensed professional, with regard to work done in that professional capacity. *See Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (Mich. 2004) ("'Malpractice, in its ordinary sense, is the negligent performance by a [professional] of the duties devolved and incumbent upon him on account with his contractual relations with his [client].'") (quoting *Delahunt v. Finton*, 221 N.W.2d 168 (Mich. 1928)); *Siirila v. Barrios*, 228 N.W.2d 801, 803 (Mich. App. 1975) ("*Malpractice is a form of negligence*, [albeit] utilizing a different standard of care than the usual 'reasonable man.'") (emphasis added), *aff'd*, 248 N.W.2d 171 (Mich. 1976).

Likewise, on the facts of this case, "the interest involved in [PFC's] claim for damages

-30-

arising out of" NTH's alleged failure to properly perform the CQA certification service called for by the Landfill-NTH contract does *not* meaningfully "differ from the interest involved in a case alleging that a professional breached the applicable standard of care" governing the engineering profession. *See generally Aldred v. O'Hara-Bruce*, 458 N.W.2d 671, 673 (Mich. App. 1990) ("The type of interest allegedly harmed is the focal point in determining which limitation period controls.") (citing *Barnard*, 350 N.W.2d at 888 (citing *Adkins v. Annapolis Hosp.*, 323 N.W.2d 482 (Mich. App. 1982))); *see, e.g., City of Dearborn v. DLZ Corp.*, 111 F. Supp.2d 900, 903-904 (E.D. Mich. 2000) (Feikens, J.) ("Dearborn's allegations in Count VI [denominated as breach of contract] state that the tunnel project failed and Dearborn was damaged due to Snell's failure to *adequately* perform its contractual duties. These are allegations that Snell, by and through Snell, failed to perform their duties as engineers. * * * Thus, I construe Count VI as a claim of professional malpractice.") (granting defendant engineering firm's motion to dismiss negligence, breach-of-contract, indemnification, fraud, misrepresentation, and conspiracy claims as time-barred under MICH. COMP. LAWS § 600.5838) (emphasis in original, citation to record omitted).

Finally, the court is not persuaded by PFC's attempt to cast the contract claims as alleging the breach of a "special agreement" and therefore eligible for the contract limitations period rather than the malpractice limitations period. PFC argues as follows:

> As to Poly-Flex's breach of contract claim, Poly-Flex has properly alleged that NTH breached its contractual obligations under the [CQA] Contract . . . with . . . Landfill . . . by failing to perform services identified in the CQA Contract. NTH's obligation to Landfill arose out of the CQA Contract, and therefore the statute of limitations for breach of contract arose out of the CQA Contract, and therefore the statute of limitation for breach of contract applies to this claim, rather than Mich. Comp. Laws § 600.5838. *Burrows v. Bidigare/Bublys, Inc.*, . . . 404 N.W. 650 ([Mich. App.] 1987) (applying six-year statute of limitations to breach of contract claim against

architect, even where the plaintiff brought a claim for architectural malpractice).[13]

* * *

*As opposed to a general promise to perform services in accordance with a professional standard of care, here, NTH promised to perform specific and discrete services described in Exhibit A to the CQA contract*, attached as Exhibit A to Poly-Flex's [Amended] Complaint.  Exhibit A sets forth a list of specific actions and duties which [NTH] promised to perform.  As alleged in the Complaint, NTH failed to perform the construction quality assessment services it promised to perform in the CQA Contract.  Subsequently, Landfill suffered damages as a result of NTH's failure to perform.  The damages claimed . . . flow directly from NTH's breach of its obligation to provide oversight, confirm conformance of construction with the engineering plans, and to certify the construction of the secondary liner system.  NTH did not contract to competently provide general engineering services under an appropriate standard of care.

PFC's Supplemental Brief filed Sept. 15, 2008 at 3 and 6 (emphasis added).

At first blush, PFC seems to present a close question, but its reliance on the special-agreement exception is ultimately unpersuasive.  In PFC's favor, it is true that the NTH-Landfill CQA agreement set forth a detailed list of tasks that NTH was obligated to complete.  *See* Comp, Ex A, Attachment A - Statement of Work (listing tasks in the categories of Subgrade/Structural Fill Certification, Secondary Liner Placement, Secondary Collection System Placement, Primary Liner Placement, Leachate Collection System Installation, Certification Report & Drawings, and Meetings & Related Services).  The Statement of Work ensured that NTH did not have unfettered discretion as to which tasks it would carry out in assessing the construction's quality.  To some degree, this distinguishes the CQA contract from a completely generalized agreement to perform whatever tasks the professional deems necessary in the course of medical treatment or legal representation.  *Contrast Aldred v. O'Hara-Bruce*, 458 N.W.2d 671, 673 (Mich. App. 1990) ("The complaint

---

[13]

PFC neglects to mention that *Burrows* was superseded by statute, *see Ostroth v. Warren Regency G.P., LLC*, 687 N.W.2d 309 (Mich. App. 2004).  The omission of *Burrows*'s subsequent history is harmless, however, because the statute addressed a different issue.

indicates that defendant was retained not to perform a specific act but to exercise appropriate legal skill in providing legal representation throughout the various stages of the criminal proceedings.").

But the fact remains that the Statement of Work did not render NTH a mere automaton, going through the steps required by Landfill with no meaningful exercise of independent professional judgment, discretion, and skill.  The Statement of Work did not purport to dictate everything that NTH could do, merely the minimum tasks that it *must* cover to satisfy the contract. Nor did the Statement of Work purport to dictate how NTH would carry out the required tasks, including how NTH should decide whether it was satisfied by each aspect of PFC's construction. On the contrary, the CQA contract expressly acknowledged that NTH would be responsible, in carrying out the specified tasks (or other tasks that it considered appropriate), for adhering to what NTH knew to be the standards of its field.  After all, only NTH as professional licensed engineers, not the Landfill, would be able to determine everything that was necessary and appropriate to a thorough construction quality assessment, or precisely *how* those tasks should best be executed.

Indeed, section 1.2, entitled Conduct of Services, provided in pertinent part, "CONSULTANT [NTH] shall perform the services promptly and in full conformity with all requirements of this Agreement, *and shall carry out its obligations under this Agreement in accordance with customarily accepted good professional engineering practices.*"  Comp Ex A, Attachment A at 2 (emphasis added).  For a jury to evaluate whether NTH met this standard, it would have to entertain testimony from experts in the engineering profession, because the contours of "customarily accepted good professional engineering practices" would not be within laymen's common knowledge and experience.  As the Michigan Supreme Court has held,

> In general, where a professional relationship exists, the differentiation between a .
> . . malpractice claim and an ordinary negligence claim depends on "whether the facts

allegedly raise issues that are within the common knowledge and experience of the
jury, or, alternatively, raise questions involving [professional] judgment."

*Dyer v. Trachtman*, 679 N.W.2d 311, 317 (Mich. 2004) (unanimous) (quoting *Dorris v. Detroit
Osteopathic Hosp. Corp.*, 594 N.W.2d 455, 465 (Mich. 1999) (citing *Wilson v. Stilwell*, 398 N.W.2d
898, 907 (Mich. 1981))).  *See, e.g., Dyer*, 679 N.W.2d at 317 ("[D]efendant's examination of
plaintiff calls upon defendant's professional judgment").[14]

PFC's next argument for application of the contract limitations period to counts one and
three relies on the principle that "[w]here the law imposes no duty on the part of NTH to perform
any acts or indemnify any party, if any such obligations arose, they arose solely because NTH
promised to do so in a contract," PFC's Supp. Br. filed Sept. 15, 2008 at 5 (citing *Huhtala v.
Travelers Ins. Co.*, 257 N.W.2d 640 (Mich. 1977)).  But the damages sought by PFC flow not from
NTH's failure to perform the tasks specified in the Statement of Work at all, but from NTH's failure
to perform those tasks *adequately* as a competent, diligent and careful firm in that profession would

---

[14]

    *Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (Mich. 2004) provides a useful
illustration of this distinction.  The Supreme Court held that a claim that a nursing home failed to
train its staff to recognize the risks posed by a particular configuration of bed rails and other
prescribed restraint systems sounded in malpractice, *id.* at 873-74, as did a claim that the nursing
home failed to recognize that the patient's bedding arrangement posed a risk of asphyxiation, *id.* at
874-75.  By contrast, the claim that the nursing home failed to take steps to protect the patient on
the day before she asphyxiated, when she was discovered tangled between the bed rails and her
mattress, sounded in ordinary negligence because

> [n]o expert testimony is necessary to determine whether defendant's employees
> should have taken *some* sort of corrective action to prevent future harm after learning
> of [this] hazard.  The fact-finder can rely on common knowledge and experience in
> determining whether defendant ought to have made an attempt to reduce a known
> risk of imminent harm to one of its charges.

*Id.* at 875.

-34-

do.  Paragraph 23 of the Amended Complaint, the only substantive paragraph in the "Breach of

Contract" claim (count one), alleges, "The aforementioned acts of NTH, *specifically the failure to*

***properly*** *perform the construction quality assessment work*, constitute a breach of the CQA

contract." (Emphasis added).  The Michigan Supreme Court has found this distinction significant

in determining whether a malpractice limitations period applies to a client's "negligence" claim.

*See Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864 (Mich. 2004):

> This claim refers to an incident . . . the day before Ms. Hunt was asphyxiated – when
> two of defendant [nursing home]'s CENAs found Ms. Hunt tangled in her bedding
> and dangerously close to asphyxiating herself in the bed rails.  According to the
> CENAs, they moved Ms. Hunt away from the rail and informed their supervising
> nurses that Ms. Hunt was at risk of asphyxiation.
>
> Plaintiff now contends, therefore, that defendant had notice of the risk of
> asphyxiation through the knowledge of its agents and, despite this knowledge of the
> problem, *defendant did nothing to rectify it*.  It bears repeating that plaintiff's
> allegation in this claim is not that defendant took inappropriate steps in dealing with
> the patient's compulsive sliding problem or that defendant's agents were negligent
> in creating the hazard in the first place.  Instead, plaintiff claims that defendant knew
> of the hazard that led to her death and did nothing about it.
>
> This claim sounds in ordinary negligence.  * * *
>                                          * * *
> * * *  Professional judgment might be implicated [and the malpractice limitations
> period applied] if plaintiff alleged that defendant responded inadequately, but, given
> the substance of plaintiff's allegation in this case, the fact-finder need only determine
> whether *any* corrective action to reduce the risk of recurrence was taken after
> defendant's agents noticed that Ms. Hunt was in peril.

*Id.* at 875; *see, e.g., Woodward Nursing Home, Inc. v. Medical Arts, Inc.*, 2006 WL 173176, *1-2

(Mich. App. Jan. 24, 2006) (applying *Bryant* test to determine whether a claim should be classified

as a medical-malpractice claim).  The Michigan Court of Appeals has applied this same distinction

between non-performance and allegedly-inadequate performance to determine whether a malpractice

limitations period applied to a "contract" claim.  *See Aldred v. O'Hara-Bruce*, 458 N.W.2d 671, 673

-35-

(Mich. App. 1990) (rejecting argument that contract limitations period applied, court stated, "Plaintiff's complaint as a whole evidences *that damages flowed not from [attorneys'] failure to represent their son, but from their failure to do so adequately. We find that this claim is grounded in malpractice only*.") (emphasis added).

Finally, PFC cites a Michigan Court of Appeals decision stating that "[t]he general rule that when choosing which of several statutes of limitation is applicable to a particular case is that the nature of damages sought, rather than the form of the action plaintiff has proceeded under, is determinative." *Rach v. Wise*, 208 N.W.2d 570, 572 (Mich. App. 1973), cited by PFC Supp. Br. filed Sept. 15, 2008 at 3. PFC argues as follows,

> There is a clear distinction between malpractice claims and breach of contract claims with respect to theory, proofs and damages recoverable. *Stewart v. Rudner* . . . 84 N.W.2d 816 ([Mich.] 1957).[15] Malpractice is predicated on the failure to exercise a certain level of professional skill, and is tortious in nature. *Id.* Conversely, actions for breach of contract are based upon a failure to perform or properly perform contractual obligations. The damages available for malpractice are personal injury and property damage, and in a contract action, damages are limited to the benefit of the non-breaching party's bargain and the damages and expenses that flow from the breach of the contractual obligations. *Id.* Poly-Flex's breach of contract claim is based upon NTH's failure to perform or properly perform its contractual obligations, and Poly-Flex's damages for NTH's breach of contract are the expenses that flowed from the breach of the contract.

PFC Supp. Br. filed Sept. 15, 2008 at 3-4. But the *Rach* rule and the *Stewart* language are of no avail to PFC, because it has not identified, and cannot identify, any relief that it sought on count one (breach of contract) or count three (contractual indemnification) that it did not seek on count two

---

[15]   In *Stewart*, the defendant was a physician who expressly agreed to perform a Caesarian section and then failed to do so, with the result that plaintiff had a conventional vaginal delivery that produced a stillborn child. The Michigan Supreme Court noted that a malpractice action is predicated on the failure to exercise the requisite skill, whereas a contract action may be based on the professional's failure to perform "'a special agreement.'" *Stewart*, 349 Mich. at 468, 84 N.W.2d 816.

(the negligence claim that the court has equated with a malpractice claim). On the contrary, *PFC sought the exact same damages* on all four of its claims.[16] *See*:

> Count One, Breach of Contract, Am Comp ¶ 24 ("As a result of said breach, Landfill and Poly-Flex suffered damages in the amount of $600,000.00 in environmental investigation and remediation costs, plus attorney fees and potential future environmental investigation and remediation costs.");

> Count II, Negligence, Am Comp ¶ 28 ("NTH's breach of its duties is the actual and proximate cause of the injury and damages suffered by Poly-Flex, including, but not limited to $600,000.00 in reimbursement to Landfill for environmental investigation and remediation costs, plus attorneys fees, and potential future environmental investigation and remediation costs.");

> Count III, Contractual Indemnification, Am Comp ¶ 31 ("By virtue of the Assignment, the benefit of the indemnification provision of the CQA Contract inures to the benefit of Poly-Flex, and thus NTH is contractually obligated to indemnify Poly-Flex, as assignee of all claims relating to the Project, for the damages suffered as a result of NTH's breach of the CQA Contract, including, but not limited to $600,000.00 in reimbursement to Landfill for environmental investigation and remediation costs, plus attorneys fees and potential future environmental investigation and remediation costs.");

> Count IV, Equitable Indemnification, Am Comp ¶ 38 ("It will be inequitable, and NTH will be unjustly enriched at the expense of Poly-Flex if NTH is not required to indemnify Poly-Flex for the costs reimbursed to Landfill for the environmental investigation and remediation costs, plus attorneys fees and potential future environmental investigation and remediation costs that are otherwise NTH's responsibility to pay.");

---

[16] This distinguishes our case from those where plaintiff sues a licensed professional (typically a medical professional) for personal-injury damages which that would not be available on the plaintiff's contract claims. *See, e.g., Kelleher v. Mills*, 245 N.W.2d 749 (Mich. App. 1976), where the defendant dentist manufactured and installed dentures that allegedly caused plaintiff patient's mouth cancer, and the plaintiff asserted claims for breach of warranty, malpractice, and fraudulent concealment. The Michigan Court of Appeals held that the patient's breach-of-warranty claim was covered by the three-year limitations period governing injury to person or property, MICH. COMP. LAWS § 5805(7), rather than the two-year limitations period then governing certain malpractice claims, MICH. COMP. LAWS § 5805(3). The panel quoted *Stewart* for the proposition that "[t]he damages recoverable for [medical] malpractice are for personal injuries, including the pain and suffering which naturally flow from the tortious act. In the contract action they are restricted to the payment made and to the expenditures for nurses and medicines or other damages that flow from the breach thereof." *Kelleher*, 245 N.W.2d at 754 n.4.

> Relief Requested, Am Comp at 8-9 ("WHEREFORE, Poly-Flex respectfully requests that this Court enter judgment against NTH in favor of Poly-Flex in the amount of $600,000.00, plus costs, attorney fees, the costs of potential future investigation and remediation costs, and for such other relief that this court finds appropriate and just.").

Moreover, PFC did not seek any *non*-monetary form of relief on the contract or equitable-indemnification claims that might distinguish those claims from the negligence/malpractice claim under the *Rach* rule.

In any event, to the extent that *Rach*'s "nature of the relief sought" test counsels application of a different limitations period than *Dyer*'s standard (focusing on whether expert testimony would be needed to resolve the claim), *Rach* is only a Court of Appeals opinion and must yield to *Dyer*, which is a Michigan Supreme Court opinion.  *See, e.g., MSU v. City of Lansing*, 2005 WL 356639, *4 (Mich. App. Feb. 15, 2005) ("*Parkview* was predicated on a Supreme Court decision which is, of course, binding precedent that trumps opinions emanating from this Court.").  *Rach* cited two Michigan Supreme Court decisions in support of its test for determining the limitations period, but those decisions must yield to the Michigan Supreme Court's later pronouncement in *Dyer* if they conflict with it.  *Cf. Sherman v. CIR*, 146 F.2d 219, 225 (6th Cir. 1945) ("Expressions in earlier opinions of the Supreme Court must yield to its more recent pronouncements . . . .").

In short, PFC's counsel has assiduously and creatively labored to fit its situation within the "type of relief" rule, or within the special-agreement exception to the rule that a malpractice limitations period applies to such claims without regard to the nomenclature used in pleadings.  And the federal courts might benefit if the Michigan Supreme Court clarified the scope of the special-agreement exception.  But this court cannot predict that the Michigan Supreme Court would allow PFC's nominally "contract" claims to escape the malpractice limitations period – which would be

hard to square with Michigan Court of Appeals decisions such as *Brownell*, *Aldred*, *Seebacher*, and *Diehl* – where PFC seeks precisely the same relief (identical damages) for the "contract" and equitable-indemnification claims as it does for its negligence/malpractice claim.  *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10ᵗʰ Cir. 2000) ("it is not our place to expand Utah state law beyond the bounds set by the Utah Supreme Court, or in the absence of Utah Supreme Court precedent, by the lower Utah courts.") (citations omitted); *Taylor v. Phelan*, 9 F.3d 882, 887 (10ᵗʰ Cir. 1993) ("As a federal court, we are generally reticent to expand state law without clear guidance from [the State's] highest court . . . .").

>   **Having determined that the general malpractice statute of limitations applies to PFC's claims, the court must determine whether the claims are timely.  They are not.**

Under MICH. COMP. LAWS § 600.5838(1), "a claim based on the malpractice of a person who is . . . a member of a state licensed profession[,] accrues at the time that person discontinues serving . . . in a professional . . . capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim."  Discussing MICH. COMP. LAWS § 600.5838(1), the Michigan Supreme Court has emphatically confirmed that

> [t]he first subsection provides that accrual occurs on the last day of professional service, regardless of when the plaintiff discovers or otherwise has knowledge of the claim.
>
> *    *    *
>
> Previous case law has confused the application of the statute by inserting traditional tort concepts of accrual into the clear statutory scheme.  *The normal rule in tort law is that a cause of action does not accrue until all elements of the tort exist.  Section 5838 expressly rejects this rule by providing that accrual occurs without regard whether the client's malpractice ["negligence"] claim is ripe.*
>
> *    *    *
>
> Here, § 5805 speaks of accrual in general terms, while 5838 defines accrual in specific terms.  Therefore, following rules of construction, the specific definition of accrual as set forth in § 5838 is interpreted to be consistent with § 5805 and is controlling.  *Accrual of a malpractice action, for purposes of the two-year limitation*

*period, occurs on the last day of professional service.*

Interpretations of the statute that suggest that a plaintiff has two years to file suit after discovering the claim render the six-month discovery period superfluous.

*Gebhardt v. O'Rourke*, 510 N.W.2d 900, 903, 903, 903-04 [sic] (Mich. 1994) (emphasis added, n.7 omitted).

Applying this provision, the claim in count two accrued on May 29, 2002, the date when NTH issued its certificate and thereby "discontinued serving" as professional CQA engineers on the project. The claim could have been brought beginning on that date. But the question is, when is the *latest* that the claim could be brought?

**Under MICH. COMP. LAWS § 600.5838(2), such a malpractice claim must be brought "within the applicable period prescribed in" MICH. COMP. LAWS § 600.5805, "or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later."** MICH. COMP. LAWS § 600.5805 is entitled Injuries to Persons or Property and provides, in pertinent part:

(1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.

\* \* \*

(6) Except as otherwise provided in this chapter [such as MICH. COMP. LAWS § 600.5839(2)], the period of limitations is 2 years for an action charging malpractice.

\* \* \*

(10) The period of limitations is 3 years after the time of the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property.

MICH. COMP. LAWS § 600.5805(1), (6) and (10). For the reasons previously discussed, PFC's claims are all essentially in the nature of professional-malpractice claims, so "the applicable period prescribed in section 5805" is the malpractice period specified in § 600.5805(6), not the longer

-40-

period which § 600.5805(8) would allow for contract claims or § 600.5805(10) would allow for "actions to recover damages for . . . injury to a person or property."

**Reading M**ICH. C**OMP. L**AWS **§ 600.5838(2) and § 600.5805(6) together,[17] the claim in count two had to be brought within two years from accrual (i.e., by about May 30, 2004), or within 6 months after PFC[18] discovered or should have discovered the existence of the claim, whichever is later.**  The question is, when should Landfill / PFC have discovered the existence of these claims against NTH?

PFC contends as follows,

> Plaintiff's injury occurred when it paid Landfill $600,000.00 to reimburse Landfill for property damage and environmental remediation in December of 2006. Landfill's injury occurred when it was forced to expend [sic] significant monies repairing the leak detection system and the resulting property damage.

---

[17]

The court follows the Michigan Supreme Court's description of the interplay of these two provisions in *Gebhardt v. O'Rourke*, 510 N.W.2d 900, 902-03 (Mich. 1994) (actually applying § 600.5838 and § 600.5805(**4**)).

[18]

As noted above, the court has not decided whether the Landfill-to-PFC assignment was valid, and if so, when it became valid and effective.  If the assignment were valid, what would be the implications for when these claims accrued?

If the assignment had been valid, PFC would stand in the shoes of Landfill, and the question would be when *Landfill's* negligence claim against NTH accrued.  *See* M ICH. C OMP. L AWS § 600.5841 ("If the claim first accrues to an ancestor, predecessor, or grantor of the person who brings the action or makes the entry, or to any other person from or under whom he claims, the period of limitations shall be computed from the time when the claim first accrued to the ancestor, predecessor, grantor, or other person, except as otherwise provided by law.").

This would be of no avail to PFC, though: nothing in the record suggests that Landfill's claims against NTH accrued any later than PFC's.  On the contrary, Landfill's claims against NTH arguably accrued *earlier* than PFC's claims.  As soon as the DEQ issued its violation letter, in May 2006, Landfill knew that it had these claims against NTH.  By contrast, PFC's claims may not have accrued until December 2006, when PFC entered the settlement agreeing to pay Landfill.

-41-

The earliest possible date on which Landfill or Plaintiff could have discovered the negligent conduct of Defendant and the resulting latent injury was when the MDEQ issued its Letter of Violation in May of 2006. Plaintiff's Complaint was filed on October 31, 2007, less than two years after the MDEQ first informed Landfill of the improper construction of the leak detection system, and less than one year after Plaintiff accepted the assignment of Landfill's claims in this matter. * * *

Even if the injury could arguably be considered to have "accrued" at the time the certification was negligently issued, Landfill and Poly-Flex had no reasonable way of knowing of Defendant's negligence until the resulting property damage was noted by the MDEQ, and until Landfill (and thus Plaintiff) was required to expend significant monies in remediation of the damage. Michigan courts are in accord that a cause of action does not accrue until the plaintiff reasonably knew or should have known of the damage caused by the defendant's negligence:

> The limitation period does not begin to run until all of the elements of the cause of action have occurred and can be alleged in a proper complaint. Where an element of a cause of action, such as damages, has occurred but cannot be pled in a proper complaint because it is not, with reasonable diligence, discoverable until sometime after it has occurred, both this Court and the Supreme Court have applied a discovery rule of accrual.

*McCann v. Brody-Built Const. Co.*, . . . 496 N.W.2d 34 [(Mich. App. 1992)]. *See also Malesev v. Board of County Road Comm'rs*, . . . 215 N.W.2d 589 [(Mich. App. 1974)]* (cause of action for property damage does not accrue until the damage becomes apparent).

The "discovery rule" would therefore be appropriately applied in this case to Plaintiff's negligence claim. As such, even if . . . the date of the [NTH] certification represents the date of injury for the purposes of the statute of limitations, Plaintiff's claim could not have accrued until either the damage was realized, or until it suffered damage by way of payment to Landfill of the monies required to remedy the damages caused by Defendant's negligence. As such, Defendant has not shown that Plaintiff's claim for negligence is time-barred . . . .

PFC's Opp at 13-15 (last paragraph break added).

When applying the discovery rule, a claim does not accrue until a plaintiff discovers, or reasonably should have discovered, an injury and the causal connection to the defendant's alleged breach of duty. *Studio B Architects, Inc. v. Paradise Assocs., Inc.*, 2005 WL 3193676, *2 (Mich.

-42-

App. Nov. 29, 2005) (P.J. Fort Hood, White, Connell) (citing *Jackson Cty. Hog Producers v. Consumers Power Co.,* 592 N.W.2d 112, 115 (Mich. App. 1999) (citing *Lemmerman v. Fealk*, 534 N.W.2d 695 (Mich. App. 1995))). However, it is not necessary that the plaintiff be able to prove every element of the cause of action before the limitations period may start to run. *Jackson Cty. Hog Producers*, 592 N.W.2d at 115 (citing *Moll v. Abbott Labs.*, 506 N.W.2d 816, 827 (Mich. 1993) (Cavanagh, C.J., joined by Riley, Brickley, & Robert P. Griffin, JJ.)). The test to determine when a cause of action accrues is based on objective facts, not on the knowledge of the particular plaintiff.

Arguably, PFC sustained its first "injury", in a practical sense, as soon as the MDEQ issued its Violation Letter on May 9, 2006, *see* Comp ¶ 14 and Ex B, for PFC knew that gave Landfill the right to demand that PFC either perform remedial work for free or pay Landfill to hire another contractor to repair or re-build the leak-detection system. But the court does not charge PFC with knowledge of the existence of a potential negligence/malpractice claim against NTH at that time.

Rather, the court finds that PFC reasonably should have known of these potential claims against NTH by the time it entered the settlement obligating it to reimburse Landfill to fix the Cell that NTH had certified compliant with the contractual drawings, State permit, and State environmental regulations. PFC entered that settlement on December 20, 2006, *see* Comp ¶ 19, so the malpractice limitations period expired six months later, on about May 20, 2007. PFC did not file the instant complaint until October 31, 2007, so the complaint is time-barred under MICH. COMP. LAWS § 600.5805(1) & (6) and § 600.5839(2) and must be dismissed.[19]

---

[19]

As to count four, equitable indemnification, NTH contends that the claim fails because PFC's admitted inadequate construction of the leak-detection system renders it an "active wrongdoer" and "actively negligent", both of which bar an assignee from securing equitable relief in Michigan. *See St. Luke's Hosp. v. Giertz*, 581 N.W.2d 665, 668 (Mich. 1998) ("Generally, indemnification is an equitable doctrine that shifts the entire burden of judgment from one tortfeasor who had been

## ORDER

For the foregoing reasons, the defendant's motion to dismiss the complaint for failure to state a claim on which relief can be granted [#16] is **GRANTED.**

The complaint is **DISMISSED**.

The case is **TERMINATED**.

This is a final and appealable order.

**IT IS SO ORDERED this 6th day of October, 2008.**


/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

compelled to pay it, to another whose active negligence is the primary cause of the harm.") (citation omitted); *Christensen*, 581 N.W.2d at 811 (*"an action for indemnification can be maintained only on the basis of an express contract, or, in the case of common-law or implied contractual indemnification, by a party who is free from negligence or fault.*") (quoting *Universal Gym Equip., Inc. v. Vic Tanny Int'l*, 526 N.W.2d 5, 8 (Mich. App. 1994) (citing *Williams v. Litton Sys., Inc.*, 449 N.W.2d 669 (Mich. 1989))) (emphasis added).

Because the court holds that PFC's complaint is untimely, it need not consider whether the equitable-indemnification claim also lacks merit.